HELANE L. MORRISON (State Bar No. 127752)
JAMES A. HOWELL (State Bar No. 92721)
JUDITH L. ANDERSON (State Bar No. 124281)
MICHAEL S. DICKE (State Bar No. 158187)
ROBERT LEACH (State Bar No. 196191)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone:  (415) 705-2500

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No.  04-1259 CW |
| Plaintiff, | COMPLAINT |
| vs. | |
| RICHARD H. HAWKINS, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1. On April 22, 1999, defendant Richard H. Hawkins, then Chief Financial Officer, authorized and made false public announcements of financial results for McKesson HBOC, Inc. ("McKesson HBOC") for the quarter and year ended March 31, 1999.  Hawkins approved financial reports that falsely stated total revenue, including revenue from a $20 million transaction between McKesson HBOC and Data General Corporation.   By including such revenue, the financial reports also materially overstated software revenue, net income and earnings per share.

2. In approving this false financial report, Hawkins acted contrary to Generally Accepted Accounting Principles and against the advice and warnings of McKesson HBOC's auditors. The transaction between McKesson HBOC and Data General was not revenue to McKesson HBOC

1  for the quarter ended March 31, 1999 because the transaction was negotiated and signed after that
2  date, the transaction was an exchange of inventory between McKesson and Data General rather than
3  a sale of product, and Data General had a right to return any McKesson product it received in the
4  transaction.  On April 22, 1999, Hawkins either knew or was reckless in not determining that the
5  transaction did not qualify as revenue to McKesson HBOC.  The day before the announcement of the
6  financial results, McKesson HBOC's auditors had told Hawkins that the Data General's right of
7  return made it an error to include the transaction as revenue.

8         3.       The Commission seeks to enjoin defendant Hawkins from future violations of
9  the federal securities laws and from serving as a director or officer of companies reporting to the
10 Commission, and to obtain disgorgement of all benefits received by Hawkins from his violations of
11 the securities laws and civil money penalties for the violations.

12        **JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

13        4.       The Commission brings this action pursuant to Section 20(b) of the Securities
14 Act [15 U.S.C. § 77t(b)], and Sections 21(d), 21(e), and 21A of the Exchange Act [15 U.S.C. §§
15 78u(d), 78u(e), and 78u-1(a)].  This Court has jurisdiction over this action pursuant to Section 22(a)
16 of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C.
17 §§ 78u(e) and 78aa].

18        5.       Hawkins, directly or indirectly, made use of the means and instrumentalities of
19 interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection
20 with the acts, practices, and courses of business and transactions alleged herein.

21        6.       This district is an appropriate venue for this action under Section 22(a) of the
22 Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain
23 of the transactions, acts, practices and courses of business constituting the violations alleged herein
24 occurred within the Northern District of California.

25        7.       Assignment to the San Francisco Division is appropriate pursuant to Civil
26 Local Rules 3-2(c) and 3-2(d) because a substantial part of the events that give rise to the claims
27 herein occurred in San Francisco County, California.
28

## THE DEFENDANT

8.      Richard H. Hawkins, age 53, was the Chief Financial Officer of McKesson Corporation from September 1996 until January 12, 1999 when the company changed its name to McKesson HBOC, Inc.  Hawkins continued to serve as Chief Financial Officer of McKesson HBOC, Inc. from January 12, 1999 until June 1999.  In January 1999, McKesson HBOC, Inc. acquired HBO & Company ("HBOC") and thereafter operated HBOC as a wholly owned subsidiary.

## THE COMPANY

9.      McKesson Corporation is a corporation organized under Delaware law with its principal place of business in San Francisco, California.  Following its acquisition of HBOC on January 12, 1999, McKesson changed its name to McKesson HBOC, Inc.  On July 25, 2001, McKesson HBOC changed its name back to McKesson Corporation.  For purposes of this complaint, however, the company will be referred to as "McKesson HBOC."  At all times relevant to this action, McKesson HBOC was primarily engaged in the manufacture and distribution of health care supplies, pharmaceuticals, and health care management software.  McKesson HBOC and its subsidiaries report their financial results to the Commission on a consolidated basis.  At all times relevant to this action, the common stock of McKesson HBOC was traded on the New York Stock Exchange and Pacific Stock Exchange.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

A.  **McKesson HBOC Falsely Reported Financial Results With Hawkins' Approval and Participation.**

10.     On April 22, 1999, McKesson HBOC issued a written press release reporting preliminary financial results to the public for the quarter and year ended March 31, 1999.  The press release stated quarterly revenue of $6.4 billion, including software revenue of $121.2 million.  The press release highlighted a software sales growth increase of 21 percent in McKesson HBOC's fourth fiscal quarter.  The company also reported net income of $177.1 million and earnings per share of 62 cents for the quarter.  The press release touted the fact that the reported earnings per share figure of 62 cents "exceeded the financial community's consensus earnings per share estimates by two cents."  All of these amounts included the revenue from a transaction between McKesson and Data General

that accounted for $20 million, or 16.5 percent, of the total software revenue reported in the press release for McKesson HBOC.

11. Also on April 22, 1999, Hawkins and other senior McKesson HBOC executives participated in a conference call with Wall Street analysts regarding McKesson HBOC's earnings figures for the quarter. They reiterated the information contained in the press release, including the revenue from the Data General transaction.

12. Hawkins approved the issuance of the April 22, 1999 press release and approved, or did not correct, the statements made in the conference call the same day.

13. The April 22, 1999 press release and related oral statements were false. Total revenue, software revenue, net income and earnings per share reported by McKesson HBOC that day were all materially overstated as a result of the inclusion in revenue of a purported sale of computer software by McKesson HBOC to Data General.

14. Without the $20 million in revenue attributed to the Data General transaction, McKesson HBOC would not have met the analysts' consensus earnings per share expectations for the period ended March 31, 1999. Moreover, absent the Data General deal, McKesson HBOC's software sales growth would have been only approximately 1 percent, as opposed to the reported 21 percent.

15. Hawkins knew, or was reckless in not determining, that McKesson HBOC's press release announcing financial results for the quarter and fiscal year ending March 31, 1999 was false and materially misleading, when issued for the reasons described below.

B. **Hawkins Had Warnings Of HBOC Improprieties In Reporting Revenue.**

16. Hawkins was CFO of McKesson when McKesson negotiated and concluded a merger agreement with HBOC. In July 1999, while investigating HBOC as a possible merger candidate, McKesson's auditors, Deloitte & Touche, learned that HBOC's auditors, Arthur Andersen, had found errors in HBOC's reporting of software revenue. In July 1999, Deloitte reported this information and other concerns about HBOC's accounting to Hawkins, who was a member of the McKesson team negotiating with HBOC management toward a possible merger. Deloitte also reported to Hawkins that the errors had been "passed" by HBOC.

17.     On or about January 6, 1999, Hawkins met with HBOC Chief Operating Officer Albert Bergonzi, HBOC Chief Financial Officer David Held and McCall at HBOC's offices in Atlanta, Georgia.  During the meeting, Held told Hawkins that Held had discovered some issues in the accounting for last two quarters, including issues about HBOC recording revenue on some transactions that were contingent and that the contingencies were stated in so-called "side letters."

18.     On January 25, 1999, McKesson HBOC issued a press release reporting results for the period ended December 31, 1998 on a pro forma basis.  In the process of preparing this report, revenues previously reported by HBOC were reversed because they did not conform to GAAP.  Hawkins reviewed and approved the pro forma report included in the press release prior to its issuance.

C.     **Fourth Quarter 1999 Revenue Goals And The Oracle Transaction**

19.     On or about January 25, 1999, McKesson HBOC management set revenue goals for the March 31 quarter, which was the fourth quarter of the company's 1999 fiscal year.  The managers set a software revenue goal for the HBOC subsidiary at $120 million.  Between February 1 and March 31, 1999, Hawkins met with Bergonzi and other senior managers in the HBOC subsidiary on several occasions to review estimates of software sales revenue for the quarter.  In these meetings, Bergonzi and others told Hawkins that HBOC would have great difficulty meeting the goal of $120 million in revenue for the quarter.

20.     In early March 1999, McKesson HBOC began negotiating with Oracle Corporation for a transaction in which McKesson HBOC would license software to Oracle for $25 million and Oracle would license software to McKesson HBOC for $30 million.  Beginning in mid-March, Hawkins and other McKesson employees negotiated with Oracle by telephone concerning the structure of the transaction.  During the week of March 22, 1999, Hawkins asked Deloitte & Touche whether McKesson HBOC could recognize revenue on the Oracle transaction under various scenarios.  Deloitte & Touche advised Hawkins that if the McKesson HBOC software and Oracle software sales were contingent upon each other, then McKesson HBOC could not recognize revenue.  Hawkins participated in several negotiating sessions with Oracle, including negotiations on the last

day of the quarter. On March 31, 1999, McKesson HBOC and Oracle ended negotiations without a contract. That evening, Hawkins told McKesson Chief Executive Officer that the Oracle deal had fallen apart and that McKesson HBOC would fall short of its revenue goals.

### D.    Hawkins Knew Or Was Reckless In Failing To Determine That The Data General Contract Could Not Be Recorded As Revenue

21.     On April 1, 1999. Bergonzi spoke by telephone with Hawkins and told him that he had started negotiations that morning with Data General for a $20 million sale. During this conversation, Bergonzi told Hawkins that (1) Data General would pay McKesson HBOC $20 million for a license to sell software to other companies, (2) McKesson would pay Data General $25 million for computer hardware and (3) McKesson will have to find customers to purchase the software from Data General, and (4) Data General wanted a right to return any software not sold within six months.

22.     On April 2 or 3, 1999, Hawkins spoke by telephone to Held and asked Held to send a copy of the Data General contract to Deloitte & Touche. In that conversation, Hawkins described the transaction between McKesson HBOC and Data General and instructed Held to document the business purpose of the transaction and support the recording of revenue on the transaction. In that same conversation, Hawkins told Held that McKesson's auditor might find that McKesson had a "cutoff" problem with the transaction, meaning that the transaction would not result in revenue to the company as of March 31, 1999.

23.     On April 5, 1999, McKesson HBOC entered into a contract with Data General for an exchange of product and services. The written contract was separated into two documents. The first document appeared to be a reseller license and distribution agreement, in which Data General purchased a license for McKesson HBOC software that Data General would resell to other customers. The purchase price to be paid by Data General was $20 million. Although executed in its entirety on April 5, 1999, the reseller license and distribution agreement was backdated to March 31, 1999. The second document was dated April 5, 1999 and written as an amendment to an existing reseller agreement between HBOC and Data General. The amendment provided for purchase by McKesson HBOC of hardware from Data General that McKesson HBOC would resell to other customers. The purchase price to be paid by McKesson HBOC was $25 million. This "amendment"

also provided that McKesson HBOC would assist Data General in reselling the software that Data General had purchased from McKesson HBOC and gave Data General an unconditional right to return any software it was unable to resell by September 30, 1999.  A false delivery receipt was created showing that McKesson HBOC had delivered software to Data General on March 31, 1999, but McKesson HBOC actually delivered the software to Data General in April 1999.

24.     Between April 2 and April 13, 1999, McKesson HBOC made an entry in its accounting records showing revenue on the Data General sale in the amount of $20 million in the quarter ended March 31, 1999.  Recognition of this revenue was inconsistent with Generally Accepted Accounting Principles because the contract was backdated and included an "inventory for inventory" exchange feature and an unconditional right of return.  At the time of this entry, Hawkins knew that the Data General transaction was backdated, that the transaction was an exchange of inventory and that Data General had a right of return.  Hawkins therefore knew, or was reckless in not knowing, that revenue from the transaction was improperly included in McKesson HBOC's revenue for the quarter and fiscal year ended March 31, 1999.

25.     On April 19, 1999, McKesson HBOC's Chief Executive Officer gave an interview to the Dow Jones news service in which he released preliminary financial results for the quarter and the fiscal year ended March 31, 1999.  According to the Chief Executive Officer, McKesson HBOC had exceeded analysts' consensus estimates of 60 cents per share for McKesson HBOC's fourth fiscal quarter.  He also was quoted as stating that software sales growth in the HBOC unit had exceeded 20 percent for the quarter.  The Chief Executive Officer gave this interview with Hawkins' approval and prior review of the content.

26.     On or about April 20, 1999, Hawkins received a message from Held that Data General had advised Held that it had received a request to provide information about the contract to Deloitte & Touche and that it would disclose in its response that Data General had a right to return McKesson's software.  Hawkins called Held and Bergonzi and talked about Data General's right to return the software within six months.  Bergonzi sent Hawkins a copy of the amendment to the Data General reseller agreement setting forth the right of return.

### E. Hawkins Misled McKesson's Auditors Concerning Data General

27. McKesson HBOC retained Deloitte & Touche to audit its financial statements for the fiscal year ended March 31, 1999. Deloitte & Touche began work on the audit prior to March 31, 1999.

28. On April 2, 1999 and again, on or about April 6, 1999, the Deloitte and Touche partner responsible for the McKesson HBOC audit, Teresa Briggs, spoke by telephone with Hawkins. In both conversations, Briggs and Hawkins discussed a portion of the Data General transaction. Briggs asked Hawkins in both conversations about the terms of the transactions and asked specifically in the second conversation whether there were any contingencies. In both conversations, Hawkins told Briggs only about Data General's purchase of a software license from McKesson HBOC for $20 million. Hawkins withheld from Briggs information about McKesson HBOC's purchase of hardware from Data General for $25 million and the dates when both contracts were negotiated and concluded.

### F. Hawkins Approved The April 22 Press Release Despite Auditor's Warnings

29. On April 21, Hawkins sent Deloitte a copy of Data General's audit response and the amendment to the Data General reseller agreement. Hawkins asked Briggs and Richard Fineberg, Deloitte partners, to meet with Hawkins at McKesson's office in San Francisco. Hawkins and other McKesson employees met with Briggs and Fineberg and had a series of discussions about the Data General transaction that continued into the early evening. There was urgency to these discussions because McKesson's management had scheduled an announcement of the company's annual earnings for the next morning.

30. During the meeting at McKesson's offices, Briggs and Fineberg told Hawkins that the revenue from the Data General transaction might affect the company's earnings per share and might indicate other revenue problems. Briggs and Fineberg also told Hawkins that they wanted to talk to the Audit Committee of McKesson's Board of Directors about the Data General transaction.

31. In the evening on April 21, 1999, Briggs, Fineberg and another Deloitte employee spoke by telephone with Hawkins and told Hawkins that the recording of revenue on the Data General transaction did not conform with Generally Accepted Accounting Principles and was an accounting error.

32. Also during the evening on April 21, 1999, Hawkins met with McKesson's Chief Executive Officer, McCall, and McKesson's controller. Hawkins told the other participants that McKesson should go ahead and announce its results including the revenue from the Data General transaction. McKesson's controller told Hawkins that she preferred to postpone the announcement until the issues concerning the Data General transaction were further examined.

33. Later during the evening on April 21, 1999, Briggs spoke with Hawkins by telephone. Hawkins told Briggs that McKesson management intended to announce McKesson's financial results the next morning including revenue from the Data General transaction. Briggs reminded Hawkins that Deloitte & Touche had asked to speak with the Audit Committee about the transaction.

34. On or about April 21, 1999, Hawkins approved the press release falsely reporting McKesson's financial results for the period ended March 31, 1999.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Thereunder*

35. The Commission realleges and incorporates by reference Paragraphs 1 through 34 above.

36. During the relevant period, defendant Hawkins and McKesson HBOC, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

      (c)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

37. Hawkins knowingly provided McKesson HBOC substantial assistance with respect to their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and is liable as an aider and abettor pursuant to Section 20(f) of the Exchange Act, 15 U.S.C. § 78t(f).

38. Hawkins violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

*Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder*

39. The Commission realleges and incorporates by reference Paragraphs 1 through 34 above.

40. By engaging in the conduct described above, defendant Hawkins knowingly circumvented the system of internal accounting controls of McKesson HBOC and caused those companies to falsify their accounting books, records and accounts.

41. Hawkins knowingly provided McKesson HBOC substantial assistance with respect to their violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, and is liable as an aider and abettor pursuant to Section 20(f) of the Exchange Act, 15 U.S.C. § 78t(f).

42. Hawkins violated and, unless restrained and enjoined, will continue to violate Section 13(b)(5) of the Exchange Act, 15 U.S.C. 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

## THIRD CLAIM FOR RELIEF

*Violation of Rule 13b2-2*

43. The Commission realleges and incorporates by reference Paragraphs 1 through 34 above.

44. By engaging in the conduct described above, and in connection with an audit or examination of the financial statements of McKesson HBOC and the preparation and filing of

statements and reports with the Commission, defendant Hawkins, directly or indirectly, made or caused to be made materially false or misleading statements to accountants and omitted to state, or caused another person to omit to state to accountants material facts necessary in order to make statements made to the accountants, in light of the circumstances under which such statements were made, not misleading.

45. Hawkins violated and, unless restrained and enjoined, will continue to violate Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

I.

Permanently enjoin defendant Hawkins from future conduct violating 15 U.S.C. §§ 78j(b) and 78m(b)(5) and 17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2.

II.

Permanently enjoin defendant Hawkins from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to 15 U.S.C. §78i or that is required to file reports pursuant to 15 U.S.C. §78o(d).

III.

Order defendant Hawkins to disgorge any wrongfully obtained benefits, including prejudgment interest.

IV.

Order defendant Hawkins to pay civil penalties.

V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VI.

1  　　　　Grant such other and further relief as this Court may determine to be just and
2  necessary.
3
4  Dated: March 30, 2004　　　　　　　　　Respectfully submitted,
5
6  　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　James A. Howell
　　　　　　　　　　　　　　　　　　　Attorney for Plaintiff
7  　　　　　　　　　　　　　　　　　　SECURITIES AND EXCHANGE COMMISSION